# Exhibit C

```
                IN THE CIRCUIT COURT
              FOR THE STATE OF TENNESSEE
           23rd JUDICIAL DISTRICT, DICKSON COUNTY

RAY FLAKE and CATHY      )
FLAKE,                   )
                         )
         Plaintiffs,     )
                         )
vs.                      )  CASE NO.
                         )  CV-1911
SALTIRE INDUSTRIAL, INC. )
f/k/a SCOVILL, INC.;     )
SCHRADER-BRIDGEPORT      )
INTERNATIONAL, INC. f/k/a)
SCHRADER AUTOMOTIVE,     )
INC.; ALPER HOLDINGS     )
U.S.A., INC.; TOMKINS    )
PLC; CITY OF DICKSON,    )
TENNESSEE; WILLIAM       )
ANDREWS; LEWIS EDWARD    )
KILMARX and JOHN DOE(S)  )
1-10,                    )
                         )
         Defendants.     )


        VIDEOTAPED DEPOSITION OF:

        WILLIAM F. ANDREWS

        Taken on behalf of the Defendants

        July 27, 2005
```

                VOWELL & JENNINGS, INC.
                Court Reporting Services
              328 Washington Square Building
                  222 Second Avenue North
                Nashville, Tennessee  37201
                       (615) 256-1935

        VOWELL & JENNINGS, INC.    (615) 256-1935

1

---

                IN THE CIRCUIT COURT
              FOR THE STATE OF TENNESSEE
           23rd JUDICIAL DISTRICT, DICKSON COUNTY

JON ARMSTRONG and        )
CHARLOTTE ARMSTRONG,     )
                         )
         Plaintiffs,     )
                         )
vs.                      )  CASE NO.
                         )  CV-1929
SALTIRE INDUSTRIAL, INC. )
f/k/a SCOVILL, INC.;     )
SCHRADER-BRIDGEPORT      )
INTERNATIONAL, INC. f/k/a)
SCHRADER AUTOMOTIVE,     )
INC.; ALPER HOLDINGS     )
U.S.A., INC.; TOMKINS    )
PLC; CITY OF DICKSON,    )
TENNESSEE; WILLIAM       )
ANDREWS; LEWIS EDWARD    )
KILMARX and JOHN DOE(S)  )
1-10,                    )
                         )
         Defendants.     )


DEPOSITION OF:

WILLIAM F. ANDREWS

Taken on behalf of the Defendants

July 27, 2005


                VOWELL & JENNINGS, INC.
                Court Reporting Services
              328 Washington Square Building
                  222 Second Avenue North
                Nashville, Tennessee  37201
                       (615) 256-1935

        VOWELL & JENNINGS, INC.    (615) 256-1935

2

---

                    IN THE CIRCUIT COURT
                  FOR THE STATE OF TENNESSEE
               23rd JUDICIAL DISTRICT, DICKSON COUNTY

DONALD and KRISTIE       )
ADKINS, et al,           )
                         )
         Plaintiffs,     )
                         )
vs.                      )  CASE NO.
                         )  CV-2022
SCHRADER-BRIDGEPORT      )
INTERNATIONAL, INC. f/k/a)
SCHRADER AUTOMOTIVE,     )
INC., et al,             )
                         )
         Defendants.     )


DEPOSITION OF:

WILLIAM F. ANDREWS

Taken on behalf of the Defendants

July 27, 2005


                VOWELL & JENNINGS, INC.
                Court Reporting Services
              328 Washington Square Building
                  222 Second Avenue North
                Nashville, Tennessee  37201
                       (615) 256-1935

        VOWELL & JENNINGS, INC.    (615) 256-1935

3

---

APPEARANCES:

For the Plaintiffs Flake:

ALFRED DAVIDSON
Barrett Law Office
One Burton Hills Boulevard
Suite 380
Nashville, Tennessee  37215

For the Plaintiffs Armstrong:

HENRY TODD
Attorney at Law
404 East College Street
Dickson, Tennessee  37055

For the Defendant Andrews:

GLENN ROSE
KENNY BYRD
Harwell, Howard, Hyne, Gabbert & Manner
315 Deaderick Street
Suite 1800
Nashville, Tennessee  37238-1800

For the Defendant Meritor:

GEORGE H. NOLAN
Boult, Cummings, Conners & Berry
1600 Division Street
Suite 700
Nashville, Tennessee  37203

For the Defendant City of Dickson:

TERESA REALL RICKS
Farrar & Bates
211 Seventh Avenue North
Suite 420
Nashville, Tennessee  37219


        VOWELL & JENNINGS, INC.    (615) 256-1935

4

## Page 5

```
 1  For the Defendant Kilmarx:
 2  JOHN OVERTON BELCHER
    Lassiter, Tidwell & Hildebrand
 3  1850 One Nashville Place
    150 Fourth Avenue North
 4  Nashville, Tennessee 37219

    For the Defendant Schrader-Bridgeport
    International, Inc.:
 6
    GREGORY T. YOUNG
 7  Bass, Berry & Sims
    AmSouth Center
 8  315 Deaderick Street
    Suite 2700
 9  Nashville, Tennessee 37238-3001

10  For the Defendant Holdings:

11  BILL RAMSEY
    Neal & Harwell
12  One Nashville Place
    Suite 2000
13  Nashville, Tennessee 37219

14  For the Defendant County of Dickson:

15  BARRY THORNTON
    Ramsey, Thornton, Barrett
16  320 East College Street
    Suite D
17  Dickson, Tennessee 37055

18
19
20
21
22
23
24
25
        VOWELL & JENNINGS, INC.    (615) 256-1935
```

## Page 6

INDEX

INDEX OF EXAMINATIONS

PAGE

Questions by Mr. Rose....................11
Questions by Mr. Davidson................84
Questions by Mr. Todd...................176
Questions by Mr. Nolan..................206
Questions by Ms. Ricks..................210
Questions by Mr. Belcher................225
Questions by Mr. Davidson...............230

INDEX OF EXHIBITS

No. 1....................32
No. 2....................88
No. 3....................90
No. 4...................102
No. 5...................110
No. 6...................123
No. 7...................131
No. 8...................136
No. 9...................138
No. 10..................138
No. 11..................139
No. 12..................147
No. 13..................160

        VOWELL & JENNINGS, INC.    (615) 256-1935

## Page 7

```
 1          The videotaped deposition of WILLIAM
 2  ANDREWS was taken by counsel for the
 3  Defendants at the offices of Harwell, Howard,
 4  Hyne, Gabbert & Manner, 315 Deaderick Street,
 5  Suite 1800, Nashville, Tennessee, on July 27,
 6  2005, for all purposes under the Tennessee
 7  Rules of Civil Procedure.
 8          The formalities as to notice,
 9  caption, certificate, et cetera, are waived.
10  All objections, except as to the form of the
11  questions, are reserved to the hearing.
12          It is agreed that Carissa L. Boone,
13  being a Notary Public and Court Reporter, may
14  swear the witness, and that the reading and
15  signing of the completed deposition by the
16  witness are not waived.
17
18
19                  *  *  *
20
21
22
23
24
25
        VOWELL & JENNINGS, INC.    (615) 256-1935
```

## Page 8

```
 1          THE VIDEOGRAPHER:  Here begins the
 2  Volume 1, Videotape No. 1, and the deposition
 3  of William F. Andrews in the matters of
 4  Donald and Kristi Adkins, et al. versus
 5  Schrader-Bridgeport Young International, Case
 6  No. CV-2022; also Ray Flake and Cathy Flake
 7  versus Saltire Industrial, et al., Case No.
 8  CV-2022; also John Armstrong and Charlotte
 9  Armstrong versus Saltire Industrial, et al.,
10  Case No. CV-1929, in the Circuit Court for
11  the State of Tennessee, 23rd Judicial
12  District, Dickson County.
13          Today's date is July 27th, 2005.
14  The time on the video monitor is 10:12.  The
15  videographer today is Tiffany Fykes of Vowell
16  & Jennings.  This video deposition is taking
17  place at Harwell, Howard, Hyne, Gabbert &
18  Manner, in Nashville, Tennessee, and was
19  noticed by Glenn B. Rose of Howell, Howard,
20  Hyne, Gabbert & Manner.
21          Counsel, please voice identify
22  yourself and state whom you represent.
23          MR. ROSE:  Glenn Rose and Kenneth
24  Byrd representing Mr. Andrews, with the firm
25  of Harwell, Howard, Hyne, Gabbert & Manner.
        VOWELL & JENNINGS, INC.    (615) 256-1935
```

Page 9:

1  MR. NOLAN: George Nolan for Arvin
2  Meritor.
3  MR. YOUNG: Greg Young for
4  Schrader-Bridgeport International, Inc.
5  MS. RICKS: Teresa Ricks for the
6  City of Dickson.
7  MR. THORNTON: Barry Thornton for
8  Dickson County.
9  MR. RAMSEY: Bill Ramsey for
10 Alpert Holdings.
11 MR. BELCHER: John Belcher for
12 Lewis Edward Kilmarx.
13 MR. TODD: Henry F. Todd, Jr., for
14 purpose of this deposition, Plaintiffs John
15 Armstrong and Charlotte Armstrong.
16 MR. DAVIDSON: Alfred Davidson for
17 Barrett Law Office for Plaintiffs -- for
18 purposes of this deposition for Plaintiffs
19 Ray Flake and Cathy Flake.
20 THE VIDEOGRAPHER: Would all
21 others present please state your name for the
22 record?
23 MR. CUNNINGHAM: Buck Cunningham.
24 THE VIDEOGRAPHER: The court
25 reporter today is Carissa Boone of Vowell &

Page 10:

1  Jennings.
2  Would the reporter please swear in
3  the witness.
4  **WILLIAM F. ANDREWS**
5  having been first duly sworn, was examined
6  and testified as follows:
7  **EXAMINATION**
8  QUESTIONS BY MR. ROSE:
9  Q. Good morning, Mr. Andrews. As you
10 know, of course, I and Kenny Byrd and other
11 attorneys of the firm of Harwell, Howard,
12 Hyne, Gabbert & Manner represent you in these
13 three actions that are pending in Dickson
14 County in Circuit Court. And we did notice
15 your deposition today, and I, as your
16 counsel, will be asking questions to you.
17 If at any time you need to take a
18 break, just let me know and we'll take a
19 break. And if at any time you don't
20 understand my questions, let me know.
21 Mr. Andrews, how old are you?
22 A. 73.
23 Q. And where do you live?
24 A. I live in Riverstone Farm in Franklin,
25 Tennessee. 1409 Moran Road.

Page 11:

1  Q. And for how long have you lived in
2  Tennessee?
3  A. This time since 1996. I lived here
4  previously from 1981 to -- I'm sorry, '91 to
5  '92, and I lived here from 1973 to 1979.
6  Q. And Mr. Andrews, did you ever work for
7  a corporation called Scovill, Inc.?
8  A. I did.
9  Q. Okay. And when did you last work for
10 that entity?
11 A. Early in 1984 -- 1985.
12 Q. And what was your position at the time
13 your employment ended?
14 A. I was the chairman, president, CEO.
15 Q. And for how long have you held each of
16 those?
17 A. I might clarify one thing.
18 Q. Sure.
19 A. The company was bought in early 1985.
20 The people who bought it were tending to
21 change the management structure. I had a,
22 you know, a contract and because they were
23 changing the managing structure I left, and
24 the people who bought it put in new
25 management.

Page 12:

1  Q. And who were the people who bought it?
2  A. The Belzbergs brothers of Canada,
3  along with a group of other investors and
4  junk bonds and things of that type.
5  Q. And did that transaction take place in
6  1984 or 1985, if you recall?
7  A. It started in 1984 and closed in early
8  '85.
9  Q. And is it correct that essentially
10 after that transaction closed that your
11 management role with Scovill effectively
12 ended?
13 A. I stayed for probably two to three
14 months after it was purchased, but they had
15 other people that they wanted to insert into
16 the company above me and as a result, I
17 thought it was best to leave.
18 Q. And so you left totally in -- sometime
19 in the spring of --
20 A. It was --
21 Q. -- 1985?
22 A. It was spring -- sometime in the
23 spring.
24 Q. Okay. And for how long did you hold
25 the position of president of Scovill?

VOWELL & JENNINGS, INC. (615) 256-1935
3 of 87 sheets     Page 9 to 12 of 237     08/23/2005 04:41:23 PM
Case 3:07-cv-00925  Document 92-3  Filed 02/23/11  Page 4 of 7 PageID #: 3444

**Page 13**

A. I became president in 1979, and in 1981, I became the chairman, president, and CEO. Malcolm Baldridge, who was the chairman and CEO when I became president, went to become the Secretary of Commerce, and when he did, the Board elected me all three titles.

Q. And once again, that would have been in 1981?

A. 1981.

Q. Okay. As of the 1980s, had Scoville been in existence for a long period of time?

A. Scovill was founded in 1802. It was the longest-paying dividend company in the New York Stock Exchange.

Q. In the 1980s, it was that -- held that title?

A. All the way until it was bought by the Belzbergs, it was the longest-paying dividend in the New York Stock Exchange -- dividend-paying company in the New York Stock Exchange.

Q. Okay. And during the period that you worked for Scovill, was it a publicly-owned company?

A. Yes.

**Page 14**

Q. Okay. And as a result, did that mean that its shares were owned by many different investors in the public?

A. Yes.

Q. Okay. And were you ever a significant shareholder of Scovill?

A. I had stock options at the time it was acquired -- about 50,000 shares -- which were purchased at the time of the takeover.

Q. What percentage of the total outstanding stock approximately would that have represented?

A. Oh, contestable.

Q. Okay. So less than 1 percent?

A. Less than a tenth of 1 percent.

Q. You indicated that Scovill was a very old company. Give us a brief overview of the history of Scovill as you understand it.

A. Scovill started to make buttons in the early days, and they supplied the armies in the War of 1812 and other wars. They made subway tokens and things like that in the very beginning. And because they were making buttons, they decided to get into the manufacture of brass, and they became one of

**Page 15**

the major brass companies in the United States. Because they were in brass, they started to reroll aluminum and draw copper tubing, and then they started to acquire companies that consumed brass. And so that was one of the reasons Schrader was acquired in the '20s, because they used a lot of brass products.

Scovill eventually became a company of six divisions divided into three groups. They were -- had a housing group which had NuTone and Yale Lock.

They had a consumer group that consisted of Hamilton Beach and Apparel Fasteners. They made snap fasteners for apparel.

And they had an automotive and industrial group which consisted of Schrader Automotive and Schrader Bellums.

And in the time it was taken over, it was about $850 million, roundabout, in sales, and it was at that time somewhere between 200 and 300 on the list of Fortune 500 Companies.

Q. And from 1979 through early 1985 as president and then as president and chief

**Page 16**

executive officer, you were the highest officer of the corporation over all of those different divisions in Scovill?

A. I was, but I reported to a Board of Directors.

Q. How many individuals were on the Board of Directors?

A. It varied, but between 10 and 12.

Q. You mentioned that Scovill acquired Schrader in the 1920s. Can you tell us a little bit more about that acquisition and what the Schrader portion of Scovill did?

A. Well, I don't remember.

Q. Right.

A. I wasn't born in the 1920s.

Q. Right. Right.

A. But Schrader was a very well-known name in valving for both automotive and industrial. And at one point, they split the business and took a completely separate approach for the industrial big valves. They did continue to make smaller industrial valves at Schrader Automotive, and we were the major supplier throughout the world of automotive tire valves and truck valves and

**Page 101**

1 I'm not sure.
2 Q. Before -- or when Kohlberg purchased
3 Schrader Automotive, Inc., or Schrader-
4 whatever the name may have been at that time,
5 who became the chairman?
6 A. (Indicating.)
7 Q. You were the chairman?
8 A. I did.
9 Q. And who was the president?
10 A. Kevin Nameth.
11 Q. And you mentioned -- I believe you
12 mentioned that Schrader and Bridge products
13 -- Bridge Products was also purchased
14 Kohlberg. Did the two companies merge?
15 A. Yes.
16 Q. Okay. And were you the chairman of
17 the --
18 A. Both companies.
19 Q. -- of both companies after -- post-
20 merger?
21 A. Yes.
22 Q. What was Mr. Wiggins's position in
23 that?
24 A. He was the president and CEO.
25 Q. Of the merged company?

**Page 102**

1 A. (Witness nods head up and down.)
2 Q. And that would be Schrader-Bridgeport.
3 And what was Mr. Nameth's role, if any, in
4 that merger?
5 A. After the merger, Kevin retired. Jim
6 Wiggins was running Bridge Products, and when
7 he put the two companies together, they
8 offered to give Kevin the job as
9 International Manager, and he decided he
10 wouldn't take that, and he retired.
11 (Discussion off the record.)
12 BY MR. DAVIDSON:
13 Q. I'm going to pass out a document that
14 should be marked as Exhibit 4.
15 (Exhibit No. 4 was marked.)
16 BY MR. DAVIDSON:
17 Q. The document to be marked as Exhibit
18 No. 4 starts with Bates No. AM 00291 and
19 concludes with Bates No. AM 00349, and is
20 titled on the first page as Transfer
21 Agreement and starts with the words
22 "Agreement, made this 28th day of October,
23 1985, by and between Scovill, Inc., and
24 chrader" -- or "Scovill, Inc., a Connecticut
25 corporation" -- Scovill, in quotes -- "and

**Page 103**

1 Schrader Automotive, Inc., a Delaware
2 corporation ('Stockholder')."
3 Mr. Andrews, have you ever seen this
4 document --
5 A. No.
6 Q. -- before? Let me ask you this then:
7 Have you ever been involved in any
8 negotiations or planning to transfer assets
9 from Scovill, Inc.'s Schrader Automotive
10 group or division to a subsidiary of Scovill,
11 in this case, Schrader Automotive, Inc.?
12 A. No. The only thing I was involved in
13 to my knowledge was they asked me to try to
14 sell Scovill Auto -- Schrader Automotive, and
15 I contacted the Arvin Group, the Pritchkards
16 and the price that I got from the Arvin Group
17 was not satisfactory and the Belzbergs
18 decided not to sell it to the Arvin Group.
19 And I don't -- I don't know what they did
20 from a standpoint of organization to
21 establish whatever way they wanted to
22 organize this to sell it.
23 Q. Are you familiar with the term SA
24 Acquisition Corporation?
25 A. SA?

**Page 104**

1 Q. Yes.
2 A. No.
3 Q. Okay. Are you aware of any subsidiary
4 corporations that Scovill may have set up in
5 the -- in early 1985?
6 A. The Belzbergs had a plan, which I
7 wasn't part of, to set up what they called
8 mirror -- I think it was the last part that
9 the accounting allowed you do this. They
10 could set up mirror businesses as separate
11 businesses from the old businesses, which
12 would part -- and that way they could
13 separate the assets in some way, and they
14 could get better tax benefits in selling it,
15 but I wasn't a party to any of that.
16 Q. Did that strategy involve transferring
17 the assets of the operating divisions of
18 Scovill into incorporated subsidiaries?
19 A. I don't really know. I know they were
20 called mirror companies, and I wasn't
21 involved in any of that planning.
22 Q. Are you aware of any discussions that
23 those mirror -- so-called mirror companies
24 were incorporated into subsidiaries into
25 which assets would be transferred -- would be

VOWELL & JENNINGS, INC. (615) 256-1935
08/23/2005 04:41:23 PM    Page 101 to 104 of 237    26 of 87 sheets
Case 3:07-cv-00925   Document 92-3   Filed 02/23/11   Page 6 of 7 PageID #: 3446

**Page 173**

1 level or Board level at all.
2 Q. Do you know when you were -- strike.
3 At any time when you were on the Board
4 of Schrader-Bridgeport International, Inc.,
  or Schrader or Schrader Automotive, Inc.,
  when it was owned by the Kohlberg Company,
7 did any of those entities engage in any kind
8 of environmental investigation or monitoring
9 in Dickson County, Tennessee?
10 A. Not to my knowledge. It never came to
11 the Board level, so my answer is no, but I
12 don't know later on down the road. But to my
13 knowledge, nothing ever came to the Board
14 level about environmental issues in Dickson
15 County while we were operating Schrader-
16 Bridge under Kohlberg.
17 Q. And that would include your not being
18 aware of any contract with the Environmental
19 Protection Agency concerning Dickson County,
20 Tennessee, specifically?
21 A. I don't recall any involvement with
22 them at that time.
23        MR. ROSE: Just to make sure
24 you're communicating, you're asking him about
25 during the '90s when it was owned by

**Page 174**

1 Schrader-Bridgeport.
2        MR. DAVIDSON: Right.
3        MR. ROSE: We're not talking about
4 the old days, we're talking about during the
5 '90s.
6        MR. DAVIDSON: During Kohlberg's
7 ownership.
8        THE WITNESS: I -- I don't -- I
9 don't recall any contact with any agencies
10 regarding Schrader or -- remember that
11 Bridgeport had its own facilities and
12 Schrader had a facility. Bridgeport had its
13 own facility before we put them together, and
14 I don't recall anything coming to the Board
15 level about environmental issues.
16        MR. DAVIDSON: Do we need to go
17 off the record while you switch tapes? Okay.
18        THE VIDEOGRAPHER: Going off the
19 record, the time is 2:18.
20        (Brief recess observed.)
21        THE WITNESS: One other person
22 that might issue an order to a purchasing
23 manager would be --
24        MR. DAVIDSON: Wait just -- she's
25 changing tapes. (Pause.)

**Page 175**

1        THE WITNESS: I just said a
2 quality control manager could issue the
3 request for a purchase order as well.
4        THE VIDEOGRAPHER: And it's 2:20;
5 we're back on record.
6        THE WITNESS: So could the
7 industrial engineering manager -- so all
8 these people in the plant, depending on what
9 they're requesting, could issue purchase
10 orders -- request purchase orders to
11 purchasing managers, these other managers.
12        MR. DAVIDSON: Mr. Andrews,
13 Mr. Todd is going to continue with the
14 questioning at this point.
15        (Discussion off the record.)
16              E X A M I N A T I O N
17 QUESTIONS BY MR. TODD:
18 Q. Mr. Andrews, I'm Henry Todd, and I
19 just have a few questions for you. I'm
20 representing the plaintiff as well for
21 purposes of this deposition, the Armstrongs.
22        First of all, I would like to ask
23 you: Mr. Kevin Nameth, I take it that he
24 succeeded you as vice president and general
25 manager of Schrader Automotive when you moved

**Page 176**

1 up from that position?
2 A. I was never vice president and general
3 manager of Schrader Automotive. I was
4 executive, group vice president
5 Q. So you were group vice president.
6 Okay. And --
7 A. And Kevin Nameth didn't come into the
8 picture until later. There were other
9 division managers before Kevin Nameth.
10 Q. Well, in 1985, whenever you left then,
11 that --
12 A. Kevin Nameth was the general manager.
13 Q. Was the general manager, okay. And
14 we've seen these letters to him from a law
15 firm down there.
16        Do you know when he would have assumed
17 that position?
18 A. Of general manager?
19 Q. Right.
20 A. Before that time. I don't remember
21 when. You have to remember, at that time I
22 was the president and CEO and the group --
23 the group had made the appointment of Kevin
24 who had formerly been the Canadian general
25 manager, and so I knew about it and I agreed,