IN THE UNTIED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| RAY FLAKE, *et al.*, | )<br>) |
| Plaintiffs, | )<br>) NO. 3:07-0925 |
| v. | ) JUDGE HAYNES<br>) |
| SCHRADER-BRIDGEPORT<br>INTERNATIONAL, INC., *et al* | )<br>)<br>) |
| Defendants. | )<br>) |

| | |
|---|---|
| JON ARMSTRONG, *et al.*, | )<br>) |
| Plaintiffs, | )<br>) NO. 3:07-926 |
| v. | ) JUDGE HAYNES<br>) |
| SCHRADER-BRIDGEPORT<br>INTERNATIONAL, INC., *et al.*, | )<br>)<br>) |
| Defendants. | ) |

| | |
|---|---|
| DONALD ADKINS, *et al.*, | )<br>) |
| Plaintiffs, | ) NO. 3:07-927 |
| v. | ) JUDGE HAYNES<br>) |
| SCHRADER-BRIDGEPORT<br>INTERNATIONAL, INC., *et al.*, | )<br>)<br>) |
| Defendants. | ) |

## M E M O R A N D U M

Plaintiffs, Tennessee citizens, filed this action originally in the Circuit Court for Dickson County, Tennessee against Defendants: Saltire Industrial, Inc., a Delaware corporation formerly known as Scovill, Inc.; Schrader-Bridgeport International, Inc., ("SBI"); Alper Holdings U.S.A., Inc., a Delaware corporation; Tomkins PLC, SBI's corporate parent; the City of Dickson, Tennessee; the County of Dickson, ArvinMeritor, Inc.,[1] successor to Schrader Automotive

---

[1] The Defendants Dickson County and ArvinMeritor, Inc. were named in an amended complaint filed in the State court (Docket Entry Nos. 15-17), and Plaintiffs' claims against Alper

Group; Lewis Edward Kilmarx, a Tennessee citizen; William F. Andrews ("Andrews"), SBI's[2] chairman, president, and chief executive officer. Plaintiffs assert Tennessee common law claims for trespass, permanent nuisance, negligence, and state statutory claims for ultra-hazardous activity, and negligence per se for violations of other statutes. Plaintiffs' claims arise out of the contamination of a spring flowing through their property into which the corporate Defendants improperly disposed or caused to be disposed hazardous wastes from the Dickson manufacturing plant.

The Defendant SBI timely removed this action in the Southern District of New York, the situs of the Scovill/Alper bankruptcy proceeding, citing 28 U.S.C. § 1334(b), the federal bankruptcy jurisdictional statute, and 28 U.S.C. § 1452, the bankruptcy removal statute. After removal, this action was transferred to this District because of its similarity to other actions in this District. In earlier proceedings, the Court denied Plaintiffs' motion to remand this action, concluding that under Sixth Circuit precedent, these actions are sufficiently related to Alper's bankruptcy proceeding to support jurisdiction under 28 U.S.C. § 1334(b). The Court also concluded that all of the requirements for mandatory abstention under 28 U.S.C. § 1334(c)(2) were not met here.

Before the Court are SBI's and ArvinMeritor's motions for summary judgment (Docket Entry Nos. 84 and 88); and Plaintiffs' motion for partial summary judgment (Docket Entry No. 90).

As to the remaining Defendants' motions for summary judgment, SBI contends that by its

---

Holdings were dismissed with prejudice in the state court. (Docket Entry No. 111). Plaintiffs' claims against the Defendants City of Dickson and Dickson County were dismissed in an earlier stage of related proceedings. Flake v. Saltire Industrial Inc., 3:06cv542, (Docket Entry No. 91, Order).

[2]Plaintiffs' claims against individual Defendants were subsequently dismissed (Docket Entry No. 78).

express agreement with Scovill during its acquisition of Scovill and its subsidiaries, Scovill retained liability for the Dickson plant, precluding any successor liability of SBI for Plaintiffs' claims. In addition, SBI cites Plaintiffs' settlement agreement with Scovill as a bar to any further relief from SBI. In its motion, ArvinMeritor contends, in essence: (1) that it is not a successor to Scovill or Schrader Automotive Group, Inc. because under ArvinMeritor's 1986 acquisition agreement, Scovill retained responsibility for the Dickson Plant; (2) that ArvinMeritor did not acquire the Dickson Plant in its 1995 agreement; and (3) that Plaintiffs' settlement with Scovill precludes any claim against ArvinMeritor.

In their motion for partial summary judgment against SBI, Plaintiffs contend that Plaintiffs' proof establishes SBI's liability for Plaintiff's claims as the successor in interest, to the liabilities of Scovill, and Schrader Automotive, Inc. that operated the Dickson, Tennessee plant caused of Plaintiffs' injuries.

## A. Findings of Fact[3]

### 1. Scovill/SAI

In the 1920s, Scovill purchased Schrader Automotive that later became Schrader Automotive Group, one of Scovill's six unincorporated division. (Docket Entry No. 92-4, McCorkle Deposition at 32-33; Docket Entry No. 92-3, Andrews Deposition at 15). In 1964 until March 1985, Schrader Automotive Group operated the Dickson, Tennessee plant at issue

---

[3]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, under Supreme Court holdings, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict. Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986). Under the applicable law, the Court concludes that there are not any material factual disputes. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

under a lease agreement with Dickson County. (Docket Entry No. 92-4, McCorkle Deposition at 30, 180).

In 1985, SA Acquisition Corp., later Schrader Automotive Inc. ("SAI") was incorporated under Delaware law as a Scovill subsidiary. Under a transfer agreement dated October 28, 1985, Scovill transferred to SAI the assets and liabilities of its Schrader Automotive Division,[4] including the assets and liabilities related to the Dickson Plant. Under the October 28, 1985 "Transfer Agreement," SAI assumed all of Schrader Automotive Group's liabilities and agreed to indemnify Scovill for the operation of the Dickson Plant's activities. (Docket Entry No. 16-3 at AM 000182-AM 000277). This agreement was "to transfer, as a liquidating distribution, all of the business, employees and assets of the Schrader Automotive Group" to Schrader Automotive, Inc. Id. at AM 000182. SAI assumed all of the liabilities of the Schrader Automotive Group, including liability of environmental matters arising from Dickson, Tennessee. Id. at AM 000182, AM 000187-AM 000188, AM 000237.

The 1985 transfer agreement between Scovill and SAI also provided that any amendment must be "only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment ... is sought." Id. at AM 000198. After execution of the transfer agreement, Schrader Automotive Group incorporated as Schrader Automotive, Inc. Plaintiffs note that after this transfer, Schrader Automotive, Inc., entered an Agreed Order in the state court describing its status: "Schrader Automotive, Inc., is successor in interest to all the rights, privileges, interest, assets, and liabilities of Scovill, Inc., doing business as Schrader Automotive Group." (Docket Entry No. 92-6, Hampton Crane Service, Inc. Schrader

---

[4] The Schrader Automotive Division was another Scovill division at the time.

4

Automotive, Inc., Agreed Order No. 85-2111171-III (Tenn. Chan. Ct. Davidson Co., November 18, 1985)).

## The SAI ArvinMeritor Merger

On March 10, 1986, ArvinMeritor, Inc., executed a purchase agreement with Scovill to acquire SAI. (Docket Entry No. 92-7). The 1986 Arvin-Scovill purchase agreement provided that, as of the closing of the transaction, SAI did not own the Dickson Plant and ArvinMeritor's purchase would not include the Dickson Plant or any liabilities and obligations associated therewith. (Docket Entry No. 92-7). Section 2.20 of that agreement states:

> Exclusion of Dickson Plant. As of the Closing Date, the Company [SAI] and the Company Subsidiaries will not own, and the Balance will not include the Dickson, Tennessee plant formerly operated by the Schrader Automotive Division, and, in any event, Buyer [ArvinMeritor, Inc.] is not assuming any liability or obligation arising out of or relating to the business and operations of the Dickson, Tennessee plant of the Schrader Automotive Division, and all liabilities (whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, secured or unsecured) associated with the Dickson, Tennessee plant.

Id. Schedule 2.4(C) listing SAI's real properties does not list the Dickson Plant. (Docket Entry No. 87-21 at 143-157). This purchase agreement required that by closing, SAI would not own the Dickson facility. Id. at § 2.20, p. SB-0029.

In an Amendment to the 1985 transfer agreement, Scovill and SAI agreed to rescind SAI's agreement to indemnify Scovill for any claims arising from the Dickson Plant. (Docket Entry No. 92-10). In the "Release," Scovill also releases SAI "from any and all indemnity obligations arising out of the Transfer Agreement dated October 28, 1985" between Scovill and SAI "in respect of which the Company [SAI] is entitled to be indemnified hereunder." Id.

At the closing of their 1986 agreement, Scovill provided ArvinMeritor a certificate warranting Scovill's fulfillment of its pre-closing obligations under that agreement and that all

representations and warranties, including those in Section 2.20, were true in all material respects. Section 2.7 of the 1986 Agreement, Scovill agreed to indemnify and hold harmless ArvinMeritor and SAI from any "judgments, awards, costs, damages, penalties, files, expenses and attorneys' fees" for any lawsuits "arising out of events occurring on or prior to the Closing date." Id. In Section 4.2, Scovill also agreed to indemnify SAI and ArvinMeritor for any breach of any representation, warranty, covenant or agreement by Scovill under the 1986 Agreement. Id. Scovill also agreed to pay all damages and costs associated with any legal claim arising out of events occurring on or before the Closing Date for the transaction. Id.

After the 1986 agreement, Scovill paid the water bill and insurance for the Dickson Plant after 1986 listing the Dickson Plant as a covered facility in its Pollution Liability policies form 1984 to 1993. (Docket Entry No. 86, Statement of Undisputed Material Facts at ¶ 19). The United States Environmental Protection Agency issued an order to Scovill to remediate the Dickson Plant and is the named party in the EPA's orders. Id. at ¶¶ 17-18. In 1988, Scovill exercised its option to purchase the Dickson Plant from Dickson County. Id. at ¶ 3. Scovill then sold the Dickson Plant to Tennsco Corporation ("Tennsco"). Id. at ¶ 4.

On February 15, 1995, ArvinMeritor sold SAI to KSCH Holdings, Inc. Id. at ¶ 24. In 1996, SAI merged with Bridge Products, Inc., with SAI as the surviving entity. Id. at ¶ 27. On June 25, 1996, SAI changed its corporate name to Schrader-Bridgeport International, Inc.

Scovill settled with its insurer all claims, including Plaintiffs' claims, arising out of remediation of the Dickson Plant and other facilities in the amount of approximately $15 million. Id. at ¶ 22. On March 7, 2007, Plaintiffs entered into a Stipulation and Order Approving Settlement with Scovill/Saltire in bankruptcy court which allowed Plaintiffs' claims for personal

injury and property damage in the aggregate amount of $1.5 million, and expressly released Scovill/Saltire from any and all other claims. Id. at ¶ 23.

### B. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment</u>. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a "material fact" for Rule 56 purposes as "[w]here the record taken as a whole could not

lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the

8

nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]…must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.</u>
>
>                         \*      \*      \*
>
> Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'</u>

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added). It is likewise true that:

> In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated.
>
> It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) (citation omitted).

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Plaintiffs state law claims arise out of activities and injuries incurred in Tennessee, and thus their claims are governed by Tennessee law. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938), Hattaway v. McKinley, 830 S.W.2d 53, 59-60 (Tenn. 1992). Thus, Tennessee law governs Defendants' contentions about the effect of Plaintiffs' settlement with Scovill.

As to the effect of Plaintiffs' settlement with Scovill on the remaining Defendants, Tennessee courts follow the Third Restatement of Torts. See Abshure v. Methodist Healthcare-Memphis Hosps., 325 S.W.3d 98, 107-08 (Tenn. 2010) (citing Comment j of Section 7 and Comment d of Section 16 of the Restatement of the Law (Third) of Torts). The Restatement as pertinent here provides that: "When a party is liable solely on the basis of another person's tortious conduct,...[those parties] are treated as a single unit for the assignment of responsibility." Restatement (Third) of Torts: Apportionment of Liability § 7 cmt. j (2000). Thus, "a settlement with one of those parties extinguishes the liability of the others." Id. at § 16 cmt. d;

In Olympia Child Dev. Center, Inc. v. City of Maryville, 59 S.W.3d 128, 134 (Tenn. Ct. App. 2001), the Tennessee Court of Appeals held that the plaintiff was "precluded from pursuing its claim against [the City] because the settlement [between the plaintiff and the City's agent] ha[d] the effect of also extinguishing the [City's] vicarious liability" for the agent's conduct:

> It matters not one whit that [the plaintiff] claims that it was not fully compensated as a result of the settlement with [the agent]. It is not the amount or adequacy of the settlement with the agent that has the effect of extinguishing the City's liability. Rather it is the mere fact that the agent's liability was extinguished by the release. If the agent can no longer be found liable in a judicial proceeding - and, in this case, he clearly cannot - then it automatically follows that the principal cannot be held liable, where, as here, the sole basis of the cause of action against the principal is vicarious in nature.

Id. at 135.

Here, the settlement stipulation between Plaintiffs and Scovill/Saltire explicitly released Scovill/Saltire from any and all other claims in connection with or related to this litigation. Because SBI's alleged liability as "successor in interest" is based solely Scovill's conduct, SBI's alleged liability as a "successor in interest" is limited to the extent of Scovill's liability. Given the Scovill-Plaintiffs' settlement, Plaintiffs' claims against SBI are extinguished absent an agreement to be bound.[5] Thus, even if SBI or ArvinMeritor were a "successor in interest" for the liabilities arising out of the Dickson Plant, Plaintiffs' settlement of their claims with Scovill/Saltire extinguished SBI's and ArvinMeritor's liability for those claims. Accordingly, that settlement is dispositive of the issues here and Defendants' motion for summary judgment should be granted.

In an abundance of caution, the Court also addresses Plaintiffs' claims based upon these Defendants' liability as successors-in-interest that Plaintiffs contend, is governed by Connecticut law in accord with the terms of the 1986 Transfer Agreement.

As to successor-in-interest liability, Connecticut law[6] provides two theories of liability:

---

[5] SBI agreed to be liable for the unpaid portion under the Scovill settlement, if any, of Plaintiffs' $1.5 million settlement with Scovill/Saltire.

[6] Tennessee law is in accord:

The traditional rule is that when one company transfers some or all of its assets to another company the successor is not liable for the debts of the predecessor except when: "(1) The purchaser expressly or impliedly agrees to assume such debts; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently in order to escape liability for such debts.... A fifth exception, sometimes incorporated ..., is the absence of adequate consideration for the sale or transfer."

Hopewell Baptist Church v. Southeast Window Mfg. Co., LLC, 2001 WL 708850, at *4 (Tenn. Ct. App. June 25, 2001).

> There are two theories used to determine whether the purchaser is merely a continuation of the selling corporation. "Under the common law mere continuation theory, successor liability attaches when the plaintiff demonstrates the existence of a single corporation after the transfer of assets, with an identity of stock, stockholders, and directors between the successor and predecessor corporations." (Internal quotation marks omitted.) Graham v. James, 144 F.3d 229, 240 (2d Cir. 1998). Under the "continuity of enterprise" theory, a mere continuation exists "if the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers." B.F. Goodrich v. Betkoski, 99 F.3d 505, 519 (2d Cir. 1996).

Chamlink Corp. v. Merritt Extruder Corp. 96 Conn. App. 183, 187-88, 899 A.2d 90 (Conn. App. 2006).

"Under the continuity of enterprise theory, a mere continuation exists if the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers." Id. at 93 (quoting B.F. Goodrich v. Betkoski, 99 F.3d 505, 519 (2d Cir. 1996). Plaintiffs also note that under Connecticut law, continuity of ownership is not an essential requirement for a business to be deemed a mere continuation." Medina v. Unlimited Systems, L.L.C., 2010 WL 5253530 at *9 (D. Conn. 2010) (applying Connecticut law to claim under the Fair Labor Standards Act where the successor was a single company shutting down and reopening as same entity under new name).

As to the first theory, Plaintiffs have not shown that SBI and Scovill or ArvinMeritor have a common identity of stock, shareholders and directors.[7] As to the second theory, by the

---

[7] See United States v. Bestfoods, 524 U.S. 51, 61, 62 (1998). An action to recover cleanup costs from industrial waste under 42 U.S.C. § 9601 et seq., the Supreme Court held that a parent corporation could not be held liable as an operator of a polluting facility owned and operated by the subsidiary unless the corporate veil could be pierced despite the common directors. ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for

14

time ArvinMeritor acquired SAI (later SBI), Scovill reacquired the Dickson Plant and retained ownership of the plant as well as responsibility for maintenance and remediation. Section 2.20 of the Purchase Agreement with ArvinMeritor expressly modified SAI's agreement to indemnify Scovill.[8] Under Connecticut law, SAI's transfer of the Dickson Plant to Scovill in 1986 does not render SAI liable for Scovill's obligation for the operation of that plant.

> The mere transfer of the assets of one corporation to another corporation or individual generally does not make the latter liable for the debts or liabilities of the first corporation except where the purchaser expressly or impliedly agrees to assume the obligations, the purchaser is merely a continuation of the selling corporation, [the companies merged] or the transaction is entered into fraudulently to escape liability.

Chamlink, 96 Conn. App. at 187, 899 A.2d at 93.

Plaintiffs' proof is that SAI is the incorporation of Schrader Automotive Group and Schrader Automotive Group employees became SAI employees, performing the same work after the transfer to SAI. Plaintiffs cite Kevin Nameth, Schrader Automotive Group general manager in 1985, who is listed in ArvinMeritor's 1986 Annual Report as SAI's President. (Docket Entry No. 92-3, Andrews Deposition at 175-176). Yet, with the 1986 transfer agreement between Scovill and ArvinMeritor, SAI transferred the Dickson Plant to Scovill and there is not any proof that SAI continued its old business. SAI did not list the Dickson plant as one of its properties. Scovill listed and insured the Dickson plant as later acquired the plant from Dickson County.

---

its subsidiary's acts.).

[8]Section 2.20 additionally provides that ArvinMeritor did not assume the liabilities of the Dickson facility in connection with the 1986 Purchase Agreement. ("Buyer" would not assume liabilities, and Buyer was defined earlier in the Agreement as ArvinMeritor. See Purchase Agreement, p. SB-0006). This provision has no affect on Schrader Automotive, Inc.'s assumption of liabilities.

15

Thus, neither ArvinMeritor nor SAI nor SBI represent a continuity of operation as of 1986 because of Scovill's reacquisition.

Plaintiffs cite the Dunlap Affidavit that SAI removed waste materials from the Dickson Plant, but the public records reflect that Scovill was the cleanup lead for the property. In addition, the contamination described in the Dunlap Affidavit relates to metal sludge materials deposited offsite from the Dickson Plant. (Docket Entry 102-4 at 4132-34; 4141). That contamination is unrelated to Plaintiffs' claims about TCE-contaminated groundwater. (Docket Entry No. 102-1, Swift Deposition at 145) (the metal sludge did not contain TCE). Even with other facts, the Court concludes that neither SBI nor ArvinMeritor is a successor to Scovill's liability for the Dickson plant under Connecticut or Tennessee.

In the motion to remand, Plaintiffs conceded that, "Plaintiffs do not claim that Arvin assumed any liability by virtue of the 1986 Agreement" and that "**Plaintiffs do not seek to recover from Arvin for acts prior to the execution of [the] March 1986 Agreement. Plaintiffs' claims against Arvin arise from its subsequent, independent negligent and grossly negligent conduct**. (Docket Entry No. 14, Memorandum in Support of Motion to Remand at 4, fn. 6) (emphasis added).

For these reasons, Defendants' motions for summary judgment should be granted.

It is so **ORDERED**.

**ENTERED** this the 23rd day of March, 2011.

WILLIAM J. HAYNES, JR.
United States District Judge